## HUTCHISON v. CRUTCHER.

## (*Nashville.* February 17, 1897.)

1. BILLS AND NOTES. *Demand and protest not essential, when.*

The general rule that the holder of a note or bill is not required to make personal or other demand on the maker, as a condition of holding the indorser, if the place of payment designated in the note or bill is closed on the day the paper falls due, is not modified or altered by the fact that a new bank is occupying the place where the old bank at which the paper was made payable had formerly been engaged in business. (*Post, pp. 422–426.*)

Cases cited: Ocoee Bank v. Hughes, 2 Cold., 52; Bynum v. Apperson, 9 Heis., 637; Lane v. Bank, 9 Heis., 419.

2. SAME. *Demand and protest essential, when.*

The holder of a bill or note, payable by its terms at a particular national bank, must, as a condition of holding the indorser, present the same to a receiver of the bank appointed by the Comptroller of the Currency because of its insolvency, and in charge of its assets, administering them for the benefit of its creditors, where the place in which he is administering his trust, though not the former banking house, is in the same city, and its location is well known in the business community. (*Post, pp. 428, 429.*)

Case cited and approved: Bank v. Junk Bros., 94 Tenn., 624.

3. SAME. *Place of payment.*

The "place of payment" of a bill or note may be a house, bank, counting-room, store, or other place of business where the holder can deposit or provide funds to meet it, and where a legal offer to pay can be made. (*Post, p. 435.*)

4. BANKS AND BANKING. *Effect of insolvency and receivership.*

The closing of the doors of a national bank by the Comptroller of the Currency, on account of insolvency, and the appointment of a receiver and placing him in charge of its assets, to ad-

minister them for the benefit of creditors, does not extinguish the corporation or work a forfeiture of its charter. (*Post, pp. 426–428.*)

Cases cited: 14 Wall., 383; 104 U. S., 54, 462; 161 U. S., 1.

5. SUBROGATION. *Not allowed, when.*

The indorsee of a note secured by a vendor's lien upon one of two lots covered by a prior vendor's lien on both, which was reconveyed by the original purchaser, is not entitled to be subrogated to the rights of the holder of the original vendor's lien in the lot retained by such purchaser because the latter, without fraud, interposed a cross bill in an action to foreclose the original vendor's lien and thereby procure the sale of the lot conveyed in exoneration of that retained, where the purchaser never became liable upon the note because of the failure of the holder to make due presentment to the maker. (*Post, pp. 429–433.*)

---

## FROM DAVIDSON.

---

Appeal from Chancery Court of Davidson County. THOS. H. MALONE, Ch.

CHAMBERS & ZARECOR for Hutchison.

J. C. McREYNOLDS for Crutcher.

BEARD, J. The complainant in this cause seeks a personal decree against the defendant as the indorser of a protested promissory note, and also to have it fixed as a lien on certain real estate described in the bill. This note, of which complainant is the owner, was executed by one Smith in 1892 to the order of the defendant, Crutcher, and

was made payable on May 31, 1896, at the Commercial National Bank, a banking institution then in successful operation in the city of Nashville. Before its maturity the Commercial National Bank was found to be insolvent, and, acting under the authority of law, the Comptroller of Currency of the United States appointed a receiver, and placed him in charge of its assets. For some time after his appointment, the receiver was engaged in winding up the business of the bank, in "the house occupied by it at the time of its suspension." He then moved its books and other assets to another building in Nashville, where he opened a receiver's office, and was there engaged in liquidating the affairs of the bank at the time this note fell due. On his removal, the Merchants' Bank took possession of the house vacated by him, and was established there at the date last mentioned. The fact of his removal, as well as the place where, after his removal, he was engaged in administering his trust, were well known in the business community of Nashville.

At maturity the note sued on was placed in the hands of a Notary, who, without making any demand, treated it as dishonored, and protested it for nonpayment. The record disclosing these facts, the Court of Chancery Appeals held that the indorser was discharged, resting their opinion upon the failure of the Notary to make demand for the payment of the note at the Merchants' Bank. The correctness of this conclusion is called in question by

the cómplainant, and we think properly so. The general rule certainly is, when the place of payment is specially designated in the note or bill—as, for instance, a bank—and it is closed on the day the paper falls due, the holder will not be required to make personal or other demand, as the paper is *ipso facto* dishonored. 3 Rand, Sec. 1115; Tiedeman Com. Pap., Sec. 314; 1 Par. N. & B., 438.

In *Ocoee Bank* v. *Hughes*, 2 Cold., 52, in recognition of this doctrine, it is said by this Court: "The law is well settled that where a place of payment is stated in the face of the bill, it will be sufficient to present the bill for payment at the place specified, and if no one can be found there, the protest may be made without demand or further inquiry." This general rule, we do not think, is modified or altered by the fact that a new bank is then occupying the place where the old corporation had formerly been engaged in business. Mr. Daniels, in his work on Neg. Insts., Vol. II., Sec. 1119, agreeing with the other text-writers just referred to, says: "If the holder, on the day of maturity, finds the bank or other place of business closed, he is not bound to make any further demand to charge either drawer or indorser." But he then adds: "If the paper is payable at a certain bank that has ceased to exist, or at the countingroom of a firm which has dissolved before its maturity, it will certainly be sufficient to make presentment to the bank which has succeeded the former institution, if

such there be, or at the countingroom of the succeeding firm, if such there be." It will be observed that the author does not say that such demand is "essential," but that it will be "sufficient." Of the cases cited to this text, only one supports this very cautious statement. In *Central Bank* v. *Allen*, 16 Me., 41, the institution at which a note was payable had gone out of existence when it matured, and another banking corporation was then occupying its former place of business, and the Court say that presentment was properly made at this latter bank. On the other hand, in *Roberts* v. *Mason*, 1 Ala., 373, it was held that, where the bank designated as the place of payment had ceased to exist, no demand was necessary, even though it had been sold to another similar corporation, which was made the former's agent for settling its affairs of discount and deposit. In such case, the Court say, a demand upon the latter would be "an act of supererogation, and of consequence ineffectual for any purpose." To the same effect are *Spain* v. *Balzell*, 1 Fla., 302, and *Berg* v. *Abbott*, 82 Pa. St., 177 (S. C., 24 A. R., 158). The other cases cited by the author, to wit: *Sanderson* v. *Oakey*, 14 La., 373, and *Bynum* v. *Apperson*, 9 Heis., 637, give no support to his text. The first of these was a suit against a maker of a note, and in no way involved the liability of an indorser; while in the last, the indorser of paper payable at the Union Bank of Memphis, in 1862, was discharged, because

the holder did not, as he might have done, present it at maturity at that bank, but, instead, held it until the close of the civil war, and then made personal demand of the maker.

Though not noted by Mr. Daniel, the Court of Chancery Appeals, seem to regard *Lane* v. *Bank*, 9 Heis., 419, as sustaining the view which they adopt. It is true, that, in the opinion in that case, the *Central Bank* v. *Allen*, *supra*, in the course of the argument on the general question of diligence, is referred to by way of illustration, but the judgment of the Court was rested upon the peculiar facts found in that record, which, taken as a whole, made ''a case of gross and inexcusable negligence,'' relieving the indorser.

Without pursuing this discussion, while disagreeing with that Court as to the ground upon which they place their judgment, we do concur with them in holding the indorser discharged, upon the facts set out in this record. We think the failure to present this note at the office of the receiver of the Commercial National Bank was laches which exonerates him. Although this bank had ceased to do business, yet it still had a legal existence.

That it was no longer a going concern in the transaction of a banking business, is certain. But it is equally certain that the act of the Comptroller of the Currency in closing its doors on account of insolvency, appointing a receiver and placing him in charge of its assets, to administer them for the ben-

efit of its creditors, did not extinguish the corpora-
tion or work a forfeiture of its charter. In the
*Bank of Bethel* v. *Pahquioque Bank*, 14 Wall. (81
U. S.), 383, the Supreme Court of the United States
say: "Beyond doubt, the appointment of a receiver
supersedes the power of the directors to exercise
the incidental power necessary to carry on the busi-
ness of banking, as the receiver is required to take
possession of the books, records, and assets of every
description of the association, and from that neces-
sarily the association is forbidden to pay out any
of its notes, discount any notes or bills, or other-
wise prosecute the business of banking, but the cor-
porate franchise is not dissolved, and the association
as a legal entity continues to exist." So it was
held in that case that a creditor might institute suit
in a State Court against a national bank after the
appointment of a receiver, and prosecute the same to
judgment. Afterwards, in *National Bank* v. *Ins. Co.*,
104 U. S., 54, the same principle was announced
and applied in the case of a national bank going
into voluntary liquidation, and *Bank of Bethel* v.
*Pahquioque Bank,. supra*, was cited and approved as
authority. In *Rosenblatt* v. *Johnson*, 104 U. S.,
462, this question again underwent examination upon
a claim of the State of Missouri to tax the assets
of a national bank in the hands of a receiver ap-
pointed by the Comptroller of the Currency. The
Court, repelling this claim, said: "Such property
and assets, in legal contemplation, still belong to the

bank, though in the hands of the receiver, to be administered under the law. The bank did not cease to exist on the appointment of a receiver." To like effect is *Commercial National Bank* v. *Hartford Deposit Co.*, 161 U. S., 1. This being the status of the Commercial National Bank at the time this note fell due, what was the duty of the Notary? We think there can be no doubt, if it had matured on a day intermediate between the one on which the bank examiner took charge and the day on which the receiver was appointed—its assets all remaining in the bank's place of business, and the doors being open —that it would have been the Notary's duty to have presented it there, before making protest. Yet, the carrying on of business incidental to banking was necessarily as completely suspended during that period of time as afterwards, when the receiver takes charge. It seems to us equally certain, if this maturity had occurred after the receiver took possession, and while he kept his office and the assets of the association at its old place of business, that presentment there would have been a condition precedent to protest. With regard to the assets of the bank, he had succeeded in a qualified degree to the trust which, while it was in active operation, was imposed by law upon the corporation itself—that is, of managing them wisely and discreetly for the benefit of its creditors. For the time being, and for the purpose of gathering in and distributing its assets, he stands in the shoes of the officers of the insolvent association con-

trolling its processes of involuntary liquidation, as would be its officers in a case of voluntary liquidation.

If the law be as we have assumed it is in the two cases put above by way of illustration, we cannot see why it should be otherwise where the receiver, still in charge, has simply removed his office and the assets of the bank to another place in the same city.   For he was still, *pro hac vice*, the representative of the corporation.   It is not a sufficient answer to this view to say that a demand at the office of the receiver would have been futile, and therefore unnecessary.   For, if this bank had been a going concern at the maturity of this paper, demand there would have been an essential prerequisite to holding the indorser, though it was shown ever so clearly that the maker had no funds there to meet it, nor was there by person or by agent to care for it.   The duty is made imperative by the designation of the place of payment, without regard to the probability of payment following such demand.   We are the more content · to rest our opinion on this ground because we think it is in harmony with the case of *American National Bank* v. *Junk Bros.*, 94 Tenn., 624.

Nor do we agree with the Court of Chancery Appeals in its holding on the other branch of this case, viz.: with regard to the equitable lien which complainant sets up in his bill.   The facts out of which this claim arises are these:   The de-

fendant, Crutcher, bought from Jolly two lots of
land, and gave three notes for the deferred payments,
all secured by a lien on the two lots.   Subsequently,
Crutcher sold and conveyed one of the lots to Smith,
who agreed, as the consideration of the sale, to dis-
charge Crutcher's notes to Jolly, and, at the same
time, to pay an additional sum, for which he exe-
cuted to his vendor the note in controversy, and a
lien was retained in the deed to Smith to secure
the discharge of these several obligations.   Smith
afterwards sold and conveyed his lot to one Hite,
who assumed two of the Crutcher notes to Jolly
and the note of Smith to Crutcher.   Jolly sold his
notes to Bainbridge, and Crutcher transferred the
Smith note, before maturity, to the present com-
plainant.   In September, 1893, Bainbridge's three
notes (the Jolly) being all due and unpaid, he filed
his bill against Crutcher, setting up a lien on both
lots, and asking for a decree of sale of the two.
In this proceeding the defendant, Crutcher, filed a
cross bill making Smith and Hite parties thereto,
alleging the sale of the one lot to Smith and the
assumptiom by him of the Bainbridge notes, as well
as the execution of the note here sued on, and the
subsequent sale by him to Hite and his assumption
of the notes, as has been already set out, and pray-
ing that the Smith lot be first sold, for the ultimate
relief of the lot reserved by him.   To this cross
bill, Hutchison, though then the owner, by transfer,
of the Smith lot, was not made a party.   A decree

was pronounced in accordance with the prayer of the cross - bill, and at a subsequent sale made thereunder the Smith lot brought just enough to pay off the Bainbridge notes and costs, leaving the other lot in defendant, Crutcher's, hands, discharged of all liability. The bill in the present cause charged that the conduct of Crutcher, in thus procuring a sale of the lot on which complainant's note was a lien, to satisfy the notes which were a lien on all the property, without notice to complainant, was contrary to equity and good conscience, and a fraud upon complainant; that Smith was insolvent, and that under these facts he was entitled in equity to have the lot retained by defendant sold to pay this note.

The Court of Chancery Appeals find that Crutcher was not guilty of fraud in filing or pressing his cross bill to a decree, but they grant complainant relief upon the theory that the defendant was bound on the note held by complainant and on the three notes of Bainbridge, and while the former note was a lien only on the Smith lot, the other notes were secured by a lien on both lots; and as the Smith lot, at the chancery sale, by paying the Bainbridge notes, relieved defendant personally, as well as his lot, from these notes, equity will let in complainant to a reimbursement out of the lot. This theory could possibly be maintained if the defendant was liable on complainant's note. But on this his liability was never at any time anything more than contingent. It was purely so at the time these

chancery proceedings in question were instituted and determined. This contingent liability never became fixed. On the contrary, the Court of Chancery Appeals have held that the failure to make proper demand of this Smith note had exonerated the indorser, so that when this present bill was filed the indorser was under no obligation whatever to take care of it. In this conclusion we have concurred. The result of this theory, therefore, if enforced, would be to subject the defendant's property to a debt upon which he personally never has been found liable, and this without fraud or wrongdoing on his part. This want of personal liability upon the part of Crutcher is a fatal objection to the application of the doctrine of subrogation, and distinguishes this case from that of *Eddy* v. *Traver*, 6 Paige Chy. R., 521, cited and relied upon in the opinion of the Court of Chancery Appeals.

The decree of that Court, relieving the indorser from a personal decree, is affirmed, and that part of it applying the rule of subrogation is reversed. The complainant's bill is dismissed.

Snodgrass, C. J., dissented from so much of this opinion as holds that the note in controversy should have been presented to the receiver of the Commercial National Bank, believing, as he does, that under the facts of this case the Notary was warranted in treating the note as dishonored without any demand.

PETITION TO REHEAR.

BEARD, J.    This case is before us on a petition for rehearing filed by complainant.    In this petition it is insisted that serious injustice has been done the petitioner (1) in failing to hold that under the circumstances of this case no demand was necessary as a prerequisite to protest; (2) in declining to follow the Court of Chancery Appeals in giving relief as to the realty.

With regard to the first proposition, it is proper to restate, briefly, the facts.    The note sued on was made payable at the Commercial National Bank of Nashville.    Some time before its maturity, this bank, having become insolvent, under the directions of the Comptroller of the Currency of the United States, had passed into the hands of a receiver, who, when the note did mature, was in charge of the bank's assets, engaged in liquidating its affairs, at a place of public notoriety in the city of Nashville.    Under these circumstances, we held that it was the Notary's duty to present this paper at that place and make demand there.

No case on all fours with this has been called to our attention, but we think that there are many cases which furnish analogies sufficiently close, when taken in connection with the general rule that the relations of the indorsee · and indorser of commercial paper are *strictissimi juris*, to furnish abundant warrant for the conclusion reached by us on that point.

14 P—28

In the rule in question the place of payment named therein had ceased to exist as a going concern, but it still existed as a legal entity, and its assets were in the hands of one who stood for that emergency in the room and stead of the officers of the bank, managing them primarily, however, for the creditors of the bank, and, after their satisfaction, for the stockholders. We do not think it could be for a moment maintained, if this bank had suspended all active business and its own officers had been winding up its affairs in the interest of creditors and stockholders, in the order named, that this note, maturing while the bank was in this condition, could have been protested without first presenting it at the bank. Nor do we think the position any more maintainable, if, immediately after the receiver took charge, and while he was administering his trust in the business house where the bank, only a few days before, had been engaged in active operations, that note had fallen due, that the holder could have protested without making demand at this particular place. In neither of these cases would the holder have a right to expect payment, as from a going concern, of his note; still, in each, the Commercial National Bank would have been an existing, legal concern, where the maker could, if he would, provide the. means to meet the note. And so it was said by this Court, in *Bynum* v. *Apperson*, 9 Heis., 637, "whether in a condition to do a general banking business or not, or whether its assets were in its vaults or in

some other place, however distant, could make no difference to the holder of the paper, nor in any way change the duties imposed upon him by the terms of the contract under the law.''

The words ''place of payment'' mean a house, bank, countingroom, store, or place of business, where the holder can present the note, where the maker can deposit or provide funds to meet it, and where a legal offer to pay can be made. *Montross* v. *Doak*, 7 Robinson, 170 (S. C., 41 A. D., 278).

We have in the office of the receiver of this bank at least enough of the essential elements here enumerated to constitute this as still the ''place of business'' where the note was payable. It was a house or countingroom, where the holder could have presented this note, where the maker could have provided funds to meet it, and where a legal effort to pay could be made. As before intimated, the contract of the indorser is conditional, and it becomes fixed only on the holder observing rules that are very technical. As illustrations of this, it will be sufficient to mention a few cases. A note payable at a particular bank must be presented there and payment demanded at maturity, to charge the indorser, though the maker informs the holder, before maturity, that a demand will be useless, as he cannot pay. 6 Met., 308 (S. C., 30 A. Dec., 734). If the maker of a note die before its maturity, and an indorser becomes his administrator, yet demand must be made upon the indorser, as adminis-

trator, and notice of nonpayment given to him, as indorser, in order to hold the latter liable. *Magruder* v. *The Union Bank*, 3 Peters, 87; affirmed in 7 Peters, 291. The holder must present the note at the place fixed for payment, at its maturity, and his failure to do so will not be excused by the insolvency of the maker, and his removal from the state. *Farwell* v. *St. Paul Tr. Co.*, 45 Minn., 495 ، (S. C., 22 A. S. R., 742).

The same rule that is illustrated in these cases, and which would have made it essential for the holder to have presented this paper at the Commercial National Bank, under the conditions first put, that is, of both voluntary and involuntary liquidation, we were satisfied to adopt and apply in this case. In reaching this conclusion, the subject was one of serious consideration, and was only arrived at after much debate, and by a majority opinion of the Court. We are entirely content with it, as we think it is in line with the best considered cases, where the general question has been carefully examined, and especially is in harmony with *Bank* v. *Junk Bros.*, already referred to.

It is insisted on the second point, that we misconstrued the finding of the Court of Chancery Appeals, as to the grounds upon which they let complainant into the Crutcher lot. In this petitioner is in error. That Court distinctly repudiated the doctrine of marshaling assets as being inapplicable in the case, and as distinctly placed their finding on

that of subrogation, and not upon the theory, suggested in the petition, that Hutchison, when he purchased the Smith note, "became an equitable owner of the lot to the extent of his lien." For he neither purchased the lien, nor by acquiring the note obtained any ownership in the lot. He simply bought the note, and, as an incident to it, the security of the lien reserved for its benefit. As before stated, the finding of that Court was rested distinctly on the rule of subrogation—a rule applied in favor of one who has been compelled to appropriate his estate to the payment of a debt for which the other party is primarily liable, and who, under the rule, is let in to any liens or equities of the creditor for his reimbursement. The doctrine rests upon the idea of the liability of the party against whom it is invoked, and can here be applied only upon the theory that Crutcher was bound on the Hutchison note.

After giving in full Sec. 262 of Brandt on Suretyship and Guaranty, which opens with this sentence: "Anyone who stands in the position of a surety or guarantor, whether strictly and technically such or not, is entitled to subrogation the same as a surety or guarantor," that Court, in its opinion, then quoted at great length from *Eddy* v. *Traver*, 6 Paige, 521, as an authority largely controlling in the present case. In that case it was held that where real estate descended to an heir at law charged with the payment of debts due from the decedent,

and such heir afterwards sold a part of the estate to another person with a warranty, and this was afterwards sold under an order of Court for the payment of such debts, that the purchaser from the heir was entitled to be reimbursed out of the remaining estate in the hands of such heir to the extent that his property had been thus taken—thus putting the purchaser in the attitude of a surety for the heir, so far as this debt was concerned, and, as such, entitled to be subrogated to the right of the creditor whose debt he had to pay. But the purchaser in that case discharged a debt, which his vendor, the heir, by his warranty had undertaken to protect him against, while in this there has never been any debtor relation of any sort on the part of Crutcher to complainant, nor has Crutcher ever been under any primary obligation to complainant to discharge either the Jolly notes or the Smith note. This essential was lacking in the case, and so we held the rule was improperly applied.

If Crutcher had been absolutely bound to complainant on the Smith note, and the Smith lot had been sold to discharge the superior lien of the Jolly notes, then it is possible equity would have brought relief to complainant by this doctrine of subrogation. But this was not the case. His liability as indorser was purely contingent, and has never become fixed. It cannot therefore be in any sense true that complainant sustained a surety relation to Crutcher, for this presupposes not only liability on

the part of Crutcher, but primary liability. It was for this reason we declined to affirm the decree of the Court of Chancery Appeals, as its effect was to make Crutcher's estate liable for an obligation from which that Court agrees with us in saying he has been discharged by the laches of complainant.

So far as fraud in the failure of Crutcher to make Hutchison a party to his cross bill is concerned, the Court of Chancery Appeals neither find it, nor do they find facts from which fraud would be necessarily inferred. If they did, however, it would not help out complainant in the present contention. While it might be if the fraud of Crutcher caused a loss to complainant, the latter might recover in an action of deceit, yet it would not give him a lien on Crutcher's property.